UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Docket No. _____

| | |
|---|---|
| MS. DOE, on behalf of her minor son, JOHN DOE, | )<br>)<br>) |
| Plaintiff | )<br>) |
| v. | )<br>) |
| PORTLAND PUBLIC SCHOOLS, DR. RYAN SCALLON, and AARON TOWNSEND, | )<br>)<br>)<br>) |
| Defendants | ) |

**COMPLAINT**
**(Injunctive Relief Requested)**

Plaintiff Ms. Doe, on behalf of her minor son, John Doe, complains against Defendants Portland Public Schools, Dr. Ryan Scallon, and Aaron Townsend, as follows:

**PARTIES AND JURISDICTION**

1.  Plaintiff Ms. Doe and her minor son, John Doe, are residents of Portland, Maine.

2.  Defendant Portland Public Schools ("Portland") is the local education agency responsible for providing a public education to the age-eligible residents of Portland, Maine.

1

3. Defendant Dr. Ryan Scallon is the superintendent of the Portland Public Schools; Defendant Aaron Townsend is the deputy superintendent.

4. Portland is a recipient of federal financial assistance for purposes of Section 504 of the Rehabilitation Act and a public entity for purposes of the Americans with Disabilities Act.

5. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331; 29 U.S.C. § 794; and 42 U.S.C. § 12133.

## FACTS COMMON TO ALL COUNTS

6. John Doe is a seventeen-year-old twelfth-grade student at Portland High School ("PHS").

7. John is a shy and very bright young man. He is member of the National Honor Society at PHS, where he maintains a GPA of 97. John is also a passionate builder and technological innovator, having built a computer from scratch during the COVID lockdown.

8. Students in Portland, unless they apply for and win a lottery slot at the smaller Casco Bay High School, have the option as incoming ninth graders to choose between whether to attend PHS or Deering High School. John opted to attend PHS in 2020 and has been enrolled at that school throughout high school.

9. John is an excellent athlete. He has been running track competitively for over a decade. He competes for PHS as a runner and

hurdler on its varsity teams for cross-country (fall), indoor track (winter), and outdoor track (spring). He is currently a senior captain of the boys' cross-country team. He also has served as a volunteer coach for the Portland Summer Recreational Youth Track Program.

10.  John has represented PHS at the New England Championships in track on eight occasions in events that include the 600m run, the 4x200m relay, the 4x800m relay, and the 300m hurdles. He has competed twice at Nationals on the PHS 4x800m relay team. That team, currently comprised of four seniors, has the achievable goal of breaking the state record for the 4x800m relay during the upcoming season.

11.  John plans to run for PHS in the Maine State Cross-Country meet, to be held on Saturday, November 4. He hopes to captain the PHS team and win the state championship. If the team qualifies, he also hopes to compete for PHS in the Cross-Country Nationals, which will be held on December 2 in Portland, Oregon.

12.  John is highly devoted to representing PHS, as he has throughout his high school career, and does not want to complete for a rival high school team.

13.  Although he just began competing in the 300m hurdles during eleventh grade, John has qualified to represent PHS at the New England

Championships and has recorded times that would be competitive at the college level.

14. John has been named to the SMAA (Southwestern Maine Activities Association) Student Athlete All-Academic Team. He is exploring options for college after his anticipated graduation in June 2024. Given his academic and athletic strengths, John is currently being recruited by several colleges and universities.

15. John also participates in the carpentry program at the Portland Arts and Technology High School ("PATHS") for half of each school day. He was a Gold Medalist in carpentry at the 2023 Maine Skills USA Leadership and Skills Competition.

16. Despite all of his strengths, John has a significant mental health disability. He has been diagnosed with Prolonged Grief Disorder, arising out of the death of his father in 2019 and his grandfather the year before, and Major Depressive Disorder.

17. John is under the care of the Robyn L. Ostrander, M.D. of the Maine Medical Center Outpatient Child/Adolescent Psychiatry unit. Since August 2, 2023, he has participated in a psychiatric evaluation and ongoing consultation with Dr. Ostrander. He also receives specialized grief counseling with a psychologist, Meredith Charney, Ph.D.

18. John's depression symptoms peaked during the spring semester of his eleventh-grade year (2022-2023), when he experienced severe loneliness, low self-esteem, and some intrusive thoughts. He has only a small circle of male friends from the track team and has not had a girlfriend. In a recent assessment using the Kovacs Children's Depression Inventory, his score on the Negative Self-Esteem Scale fell in the "very elevated" range.

19. During the spring semester, at the depths of his depression, John sent some text messages to friends that were concerning. Some of the messages referenced rape or murder. John's treating psychiatrist, however, explained that these inappropriate messages reflected a need to be recognized by a student who was feeling lonely and unseen. A school psychological evaluator selected by Portland similarly described these messages as reflecting "a request for help, to be stopped from committing any violent acts, and to seek recognition and attention from others."

20. John has no history of violence, nonviolent offenses, delinquent behavior, substance abuse, or anger issues. He had no school disciplinary history at all prior to last month.

21. On September 22, 2023, Portland suspended John from school after receiving an anonymous report concerning a lengthy sexualized text message John had composed in June 2023, then re-sent to another peer in

5

late August 2023. The expression for which Defendants disciplined John was made entirely off-campus.

22. In the text, John revealed that he was "blessed with the odd mindset that inherits deep and severe mental illness." The text referenced (but was not sent to) a female peer, who is a member of the girls' cross-country and track teams at PHS, and described her as the object of his sexual desire. In one passage it stated: "With the increased risk of murder when around me, she is scared." Portland interpreted the text as a potential threat to the female peer and sent a copy of the text to her parents.

23. A Portland social worker conducted a so-called "threat assessment," in which both Ms. Doe and John participated. Portland High School's principal, Sheila Jepson, informed the Does that upon completion of the assessment and review by the administrators on September 27, John would be able to return to PHS the following day.

24. Principal Jepson called Ms. Doe on September 28 to request a meeting with her and Portland's social worker. At the meeting, Principal Jepson requested more time to develop the steps for John's re-entry to PHS. She stated that John would have to surrender his cell phone while in his PHS classes. Plaintiffs agreed with this condition. The parties agreed to meet again on October 4 to go over the points of a proposed re-entry plan so John could get back to PHS.

25. At the meeting on October 4, Principal Jepson was joined by the Defendant Townsend, the Deputy Superintendent. Townsend requested a second assessment of John utilizing a psychologist before permitting him to return to PHS. Defendants required John to remain out of school for several days while the psychologist conducted this assessment, telling John and his mother that this removal was not "disciplinary," but designed to ensure his safe and successful return to PHS.

26. John and his mother cooperated with Portland's second assessment process. Meanwhile, John participated in private therapy and completed his PHS school work through tutorials. He was barred, however, from his carpentry classes at PATHS and from participating in athletics. As a result, he was unable to participate in the Cross-Country Regional Championships on October 21, 2023.

27. John's private psychiatrist, Dr. Ostrander, communicated to Portland concerning his prolonged absence from PHS. She encouraged Portland to permit him to continue his education at PHS and get back to his friends and athletics. She wrote that John's "mood has been improving," and that he "does not have thoughts about harming or killing others, and does not have thoughts about or intent to harm or kill himself." She continued:

> He has never harmed himself or others, or threatened to do so. He does not present as a risk to himself or the community. Since the Spring of this

7

>year his degree of depressive symptoms has lessened, in part due to being in treatment for his mental health, and also due to the social connections he has made with peers, most importantly on the track team. He is oriented toward the future and actively working on college applications.

28. Having reviewed the text message during sessions with John, Dr. Ostrander concluded that it reflected his need to be recognized during a period when he was lonely and feeling unseen, and that he did not realize that the person to whom he sent the text would interpret it from a perspective different from his own, nor anticipate that the peer would share the message with others or with the school.

29. John met with the psychologist appointed by Portland and cooperated fully in the second assessment, just as he had with the first. The psychologist's report, dated October 20, 2023, includes no finding or determination that John poses any risk substantial enough to exclude him from returning to PHS.

30. The psychological report recommends that John continue his community-based counseling; meet weekly with the PHS social worker, who would collaborate with his community-based counselor; use therapy to prepare for potential negative peer comments and avoid a conflictual response; learn to control his negative thoughts; be assisted in developing a positive self-image by recognizing his strengths, assets, and long-term career

8

goals; learn healthy coping skills; be assisted in identifying factors that may influence recurrence of past behaviors and prevent recurrence; and participate in regular home-school meetings.

31. John is anxious to return to PHS and to his peers on the boys' cross-country and track teams. He has agreed to abide by all of the recommendations set forth in the psychological assessment report.

32. Having been encouraged to do so by Portland, the mother of the female peer named in John's text filed a complaint in the Maine District Court seeking protection from harassment by John. The complaint made no allegation of any physical or in-person verbal harassment, nor did it allege that John ever had harassed her daughter by sending her any electronic communications. The focus of the complaint was that her daughter had been named in the text John had sent to a third party.

33. On October 20, 2023, the proceedings in the Maine District Court ended with issuance of a stipulated order—seen and agreed by both parties—without a finding of harassment. Under the terms of the court's stipulated order, John was cleared to return to school and athletics at PHS with conditions, including refraining from physical and electronic contact with the female peer and not attending team dinners and banquets that involve both the boys' and girls' teams.

34. Defendants, having received the psychological assessment report and the District Court order, then decided that John may not return to PHS. On October 25, Defendants issued to Plaintiffs a so-called "Return to School" Plan that amounts to an involuntary transfer, prohibiting John from taking classes at PHS or competing in athletics for PHS. The involuntary transfer plan requires that John attend and compete in athletics at a different high school within the district, thereby severing all his social relationships with his PHS peers and teammates and upending his academic schedule midway through his twelfth-grade year.

35. John worked hard to schedule his twelfth-grade classes at PHS and PATHS in a manner that would allow him to complete both his academic requirements and his carpentry certification successfully. He is taking pre-calculus and physics at PHS as prerequisites for the Electrical and Computer Engineering program he wishes to pursue in college. He is invested in his current PHS classes and has been working with his teachers, tutor, and senior planning advisor to complete all his work.

36. Although Portland's suspension of John already has cost him 46 hours of work toward his carpentry certification through PATHS, he remains committed to making up those hours and completing the program.

37. Having to switch schools halfway through the first semester of twelfth grade would irreparably harm John by risking an interruption of his

scheduled academic classes, causing him to be unable to earn the course prerequisites he needs for college, and by severely disrupting the recruiting and college application process in which he is currently engaged. John's college applications undoubtedly would need to address the damaging question of why he no longer attends or competes for PHS.

38.     Prohibiting John from returning to PHS, the school he has attended and competed for since entering high school, contradicts the recommendation of his treating physician for addressing his disability. Dr. Ostrander recommends that John resume his former routine at PHS at the earliest possible opportunity for therapeutic reasons. This includes a return to his academic schedule, to his peer support group on the cross-country and track teams, and to athletic training and competition.

39.     Portland's involuntary transfer order is not required by the Maine District Court's protection order, nor was it recommended by the psychologist hired by Defendants to conduct John's second assessment.

40.     Defendant Townsend told Ms. Doe that the involuntary transfer was necessary because five female students do not feel comfortable having John return to PHS. Defendants, therefore, are basing the involuntary transfer not on the expert views of John's treating physician or their chosen psychological evaluator, but on a vague expression of fear concerning a student with a mental health disability who is in treatment and poses no risk

11

of harm. Acquiescing to such a stereotypical fear concerning John's return to school amounts to discrimination on the basis of his mental health disability.

41. Plaintiffs have no adequate remedy at law.

## COUNT I
**(Violation of First Amendment Rights, 42 U.S.C. § 1983)**

42. Plaintiff repeats the allegations contained in paragraphs 1 through 41.

43. The First Amendment to the U.S. Constitution guarantees the right to free speech.

44. 42 U.S.C. § 1983 provides a cause of action for damages against any person acting under color of law who deprives another person of rights guaranteed by the Constitution or laws of the United States.

45. Defendants acted under color of law in determining that John must be involuntarily transferred to a different high school due to the content of his private text message.

46. John's text message is off-campus speech entitled to the protection of the First Amendment.

47. John's text message does not satisfy the test for a "true threat." Even if it did, the evidence does not support that John acted with the requisite recklessness in sending the text—making a "deliberate decision to

endanger another" and "consciously accept[ing] a substantial risk of inflicting serious harm"—so as to permit him to be sanctioned for his speech.

48. Penalizing John by transferring him involuntarily away from PHS amounts to a violation of his First Amendment right to free speech and retaliation for his exercise of protected First Amendment rights.

## COUNT II
**(Section 504 of the Rehabilitation Act, 29 U.S.C. § 794)**

49. Plaintiff repeats the allegations contained in paragraphs 1 through 41.

50. Section 504 of the Rehabilitation Act of 1973 prohibits recipients of federal financial assistance from engaging in intentional discrimination on the basis of disability. 29 U.S.C. § 794 ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .")

51. John is a qualified individual with a mental health disability under section 504. In addition, John's text message reveals his mental illness. Defendant Portland has regarded him as having a mental health disorder in the course of assessing and sanctioning him for his speech.

52. Defendant Portland, a recipient of federal financial assistance, has engaged in intentional discrimination by involuntarily transferring John to a different high school based on students' expressed discomfort in having John return to PHS, despite no evidence that he poses a risk to any students or staff at PHS.

53. Acquiescing to this vague, stereotypical expression of fear concerning a student with a mental health disability, who is in treatment and poses no risk of harm, amounts to discrimination on the basis of a mental health disability, in violation of section 504.

## COUNT III
**(Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132)**

54. Plaintiff repeats the allegations contained in paragraphs 1 through 41.

55. Title II of the Americans with Disabilities Act prohibits a public entity, including a public school district like Defendant Portland, from engaging in intentional discrimination on the basis of disability. 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

56. John is a qualified individual with a mental health disability under the ADA. In addition, John's text message reveals his mental illness. Defendant Portland has regarded him as having a mental health disorder in the course of assessing and sanctioning him for his speech.

57. Defendant Portland, a public entity, has engaged in intentional discrimination by involuntarily transferring John to a different high school based on students' expressed discomfort in having John return to PHS, despite no evidence that he poses a risk to any students or staff at PHS.

58. Acquiescing to this vague, stereotypical expression of fear concerning a student with a mental health disability, who is in treatment and poses no risk of harm, amounts to discrimination on the basis of a mental health disability, in violation of Title II of the ADA.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor against Defendants and award her:

    a. injunctive relief permitting John to return to continue his twelfth-grade year at Portland High School for both academics and athletics under the agreed-upon conditions;

    b. compensatory damages in an amount that is reasonable in the premises;

    c. reimbursement of reasonable costs and attorney's fees under 42 U.S.C. § 1988, the Rehabilitation Act, and the ADA; and

15

      d.  such other relief as the court may deem just and proper.


Dated:  October 30, 2023           Respectfully submitted,

                                        /s/ Richard L. O'Meara
                                        Richard L. O'Meara
                                        *E-mail:*  romeara@mpmlaw.com

                                        /s/ Ellen P. Masalsky
                                        Ellen P. Masalsky
                                        *E-mail:*  emasalsky@mpmlaw.com

                                        MURRAY, PLUMB & MURRAY
                                        75 Pearl Street, P.O. Box 9785
                                        Portland, ME  04104-5085
                                        (207) 773-5651

                                        Counsel for Plaintiff