UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

|  |  | Docket No. _____ |
|---|---|---|
| MS. DOE, on behalf of her minor son, JOHN DOE, | ) ) ) | |
| Plaintiff | ) ) ) | |
| v. | ) ) | |
| PORTLAND PUBLIC SCHOOLS, DR. RYAN SCALLON, and AARON TOWNSEND, | ) ) ) ) ) | |
| Defendants | ) | |

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, WITH INCORPORATED MEMORANDUM OF LAW**

Pursuant to Rules 65(a) and 65(b) of the Federal Rules of Civil Procedure, Plaintiff Ms. Doe, on behalf of her minor son, John Doe, requests that the Court enter a temporary restraining order and preliminary injunction maintaining John's school placement at Portland High School.

Ms. Doe brings this action against Defendants Portland Public Schools, its superintendent, Dr. Ryan Scallon, and deputy superintendent, Aaron Townsend, seeking injunctive relief to stop Defendants' plan to transfer her son, John Doe, involuntarily to a different high school. She is entitled to such relief as the involuntary transfer violates John's First Amendment right to free speech and amounts to discrimination on the basis of disability.

## STATEMENT OF FACTS

John Doe is a seventeen-year-old twelfth-grade student at Portland High School ("PHS"). He is a shy and very bright young man. He is member of the National Honor Society at PHS, where he maintains a GPA of 97. *Doe Decl.* ¶¶ 2-3. Students in Portland have the option as incoming ninth graders to choose between whether to attend PHS or Deering High School. John opted to attend PHS in 2020 and has been enrolled at that school throughout high school. *Doe Decl.* ¶ 4.

John is an excellent athlete. He competes for PHS as a runner and hurdler on its varsity teams for cross-country (fall), indoor track (winter), and outdoor track (spring). He is currently a senior captain of the boys' cross-country team. *Doe Decl.* ¶ 5. John has represented PHS at the New England Championships in track on eight occasions in events that include the 600m run, the 4x200m relay, the 4x800m relay, and the 300m hurdles. He has competed twice at Nationals on the PHS 4x800m relay team. That team, currently comprised of four seniors, has the achievable goal of breaking the state record for the 4x800m relay during the upcoming season. *Doe Decl.* ¶ 6

John plans to run for PHS in the Maine State Cross-Country meet, to be held on Saturday, November 4. He hopes to captain the PHS team and win the state championship. *Doe Decl.* ¶ 7. John is highly devoted to representing PHS, as he has throughout his high school career, and does not want to

2

complete for a rival high school team. Although he just began competing in the 300m hurdles during eleventh grade, John has qualified to represent PHS at the New England Championships and has recorded times that would be competitive at the college level. *Doe Decl.* ¶¶ 8-9. He is exploring options for college after his anticipated graduation in June 2024. Given his academic and athletic strengths, John is currently being recruited by several colleges and universities. *Doe Decl.* ¶ 10. John also participates in the carpentry program at the Portland Arts and Technology High School ("PATHS") for half of each school day. He was a Gold Medalist in carpentry at the 2023 Maine Skills USA Leadership and Skills Competition. *Doe Decl.* ¶ 11.

Despite all of his strengths, John has a significant mental health disability. He has been diagnosed with Prolonged Grief Disorder, arising out of the death of his father in 2019 and his grandfather the year before, and Major Depressive Disorder. *Doe Decl.* ¶ 12. John is under the care of the Robyn L. Ostrander, M.D. of the Maine Medical Center Outpatient Child/Adolescent Psychiatry unit. Since August 2, 2023, he has participated in a psychiatric evaluation and ongoing consultation with Dr. Ostrander. He also receives specialized grief counseling with a psychologist, Meredith Charney, Ph.D. *Doe Decl.* ¶ 13; *Ostrander Decl.* ¶¶ 4-6.

John's depression symptoms peaked during the spring semester of his eleventh-grade year (2022-2023), when he experienced severe loneliness, low

3

self-esteem, and some intrusive thoughts. His score on a recent assessment using the Kovacs Children's Depression Inventory on the Negative Self-Esteem Scale fell in the "very elevated" range. *Doe Decl.* ¶ 14.

During the spring semester, at the depths of his depression, John sent some text messages to friends that were concerning. Some of the messages referenced rape or murder. John's treating psychiatrist, however, explained that these inappropriate messages reflected a need to be recognized by a student who was feeling lonely and unseen. *Doe Decl.* ¶ 15; *Ostrander Decl.* ¶¶ 7-9. John has no history of violence, nonviolent offenses, delinquent behavior, substance abuse, or anger issues. He had no school disciplinary history at all prior to last month. *Doe Decl.* ¶ 16.

On September 22, 2023, Portland suspended John from school after receiving an anonymous report concerning a lengthy sexualized text message John had composed in June 2023, then re-sent to another peer in late August 2023. The expression for which Defendants disciplined John was made entirely off-campus. *Doe Decl.* ¶ 17 and Ex. 1. In the text, John revealed that he was "blessed with the odd mindset that inherits deep and severe mental illness." *Doe Decl.* Ex. 1. The text referenced (but was not sent to) a female peer and described her as the object of his sexual desire. In one passage it stated: "With the increased risk of murder when around me, she is scared." Portland interpreted the text as a potential threat. *Doe Decl.* ¶ 18 and Ex. 1.

4

A Portland social worker conducted a so-called "threat assessment," in which both Ms. Doe and John participated. PHS's principal informed the Does that upon completion of the assessment and review by the administrators on September 27, John would be able to return to PHS the following day. *Doe Decl.* ¶ 19. The principal called Ms. Doe on September 28 to request a meeting with her and Portland's social worker. At the meeting, the principal requested more time to develop the steps for John's re-entry to PHS. The parties agreed to meet again on October 4 to go over the points of a proposed re-entry plan so John could get back to PHS. *Doe Decl.* ¶ 20.

At the meeting on October 4, Defendant Townsend, the Deputy Superintendent, joined the principal. Townsend requested a second assessment of John by a psychologist before permitting him to return to PHS. Defendants required John to remain out of school for several days while the psychologist conducted this assessment, telling Plaintiff his removal was not "disciplinary," but designed to ensure his safe return to PHS. *Doe Decl.* ¶ 21.

John and his mother cooperated with Portland's second assessment process. Meanwhile, John participated in private therapy and completed his PHS school work through tutorials. He was barred, however, from his carpentry classes at PATHS and from participating in athletics. As a result, he was unable to participate in the Cross-Country Regional Championships on October 21, 2023. *Doe Decl.* ¶ 22.

John's private psychiatrist, Dr. Ostrander encouraged Portland to permit him to continue his education at PHS and get back to his friends and athletics. She wrote that John's "mood has been improving," and that he "does not have thoughts about harming or killing others, and does not have thoughts about or intent to harm or kill himself." She continued:

> He has never harmed himself or others, or threatened to do so. He does not present as a risk to himself or the community. Since the Spring of this year his degree of depressive symptoms has lessened, in part due to being in treatment for his mental health, and also due to the social connections he has made with peers, most importantly on the track team. He is oriented toward the future and actively working on college applications.

*Doe Decl.* ¶ 23; *Ostrander Decl.* ¶¶ 10-11 and Ex. 1. Having reviewed the June 2023 text message during sessions with John, Dr. Ostrander concluded that it reflected his need to be recognized during a period when he was lonely and feeling unseen, and that he did not realize that the person to whom he sent the text would interpret it from a perspective different from his own, nor anticipate that the peer would share the message with others or with the school. *Doe Decl.* ¶ 24; *Ostrander Decl.* ¶ 9.

John met with the psychologist appointed by Portland and cooperated with this assessment. The psychologist's report, dated October 20, 2023, includes no finding or determination that John poses any risk substantial enough to exclude him from returning to PHS. *Doe Decl.* ¶ 25 and Ex. 2. The psychological report recommends that John continue his community-based

6

counseling; meet weekly with the PHS social worker, who would collaborate with his community-based counselor; use therapy to prepare for potential negative peer comments and avoid a conflictual response; learn to control his negative thoughts; be assisted in developing a positive self-image by recognizing his strengths, assets, and long-term career goals; learn healthy coping skills; be assisted in identifying factors that may influence recurrence of past behaviors and prevent recurrence; and participate in regular home-school meetings. *Doe Decl.* ¶ 26 and Ex. 2. John is anxious to return to PHS and to his peers on the boys' cross-country and track teams. He has agreed to abide by all of the recommendations set forth in the psychological assessment report. *Doe Decl.* ¶ 27.

Having been encouraged to do so by Portland, the mother of the female peer named in John's text filed a complaint in the Portland District Court seeking protection from harassment by John. The complaint made no allegation of any physical or in-person verbal harassment, nor did it allege that John ever had harassed her daughter by sending her any electronic communications. The focus of the complaint was that her daughter had been named in the text John had sent to a third party. *Doe Decl.* ¶ 28.

On October 20, the proceedings ended with issuance of a stipulated order—seen and agreed by both parties—without a finding of harassment. Under the terms of the court's stipulated order, John was cleared to return to

7

school and athletics at PHS with conditions, including refraining from physical and electronic contact with the female peer and not attending team dinners that involve both the boys' and girls' teams. *Doe Decl.* ¶ 29 and Ex. 3.

Defendants, having received the psychological assessment report and the District Court order, then decided that John may not return to PHS. On October 25, Defendants issued a so-called "Return to School" Plan that amounts to an involuntary transfer, prohibiting John from taking classes at PHS or competing in athletics for PHS. The involuntary transfer requires that John attend and compete in athletics at a different high school within the district, thereby severing all his social relationships with his PHS peers and teammates and upending his academic schedule. *Doe Decl.* ¶ 30.

John worked hard to schedule his twelfth-grade classes at PHS and PATHS in a manner that would allow him to complete both his academic requirements and his carpentry certification successfully. He is taking pre-calculus and physics at PHS as prerequisites for the Electrical and Computer Engineering program he wishes to pursue in college. He is invested in his current PHS classes and has been working with his teachers, tutor, and senior planning advisor to complete all his work. *Doe Decl.* ¶ 31.

Having to switch schools halfway through the first semester of twelfth grade would irreparably harm John by risking an interruption of his scheduled academic classes, causing him to be unable to earn the course

8

prerequisites he needs for college, and by severely disrupting the recruiting and application process in which he is currently engaged. John's college applications undoubtedly would need to address the damaging question of why he no longer attends or competes for PHS. *Doe Decl.* ¶¶ 32-33.

Prohibiting John from returning to PHS, which he has attended and competed for since ninth grade, contradicts the recommendation of his treating physician for addressing his disability. Dr. Ostrander recommends that John resume his former routine at PHS at the earliest possible opportunity for therapeutic reasons. This includes a return to his academic schedule, to his peer support group on the cross-country and track teams, and to athletic training and competition. *Doe Decl.* ¶ 34; *Ostrander Dec.* ¶ 11.

Portland's involuntary transfer order is not required by the stipulated protection order, nor was it recommended by the psychologist hired by Portland to conduct John's second assessment. Townsend told Ms. Doe that the involuntary transfer was necessary because five female students do not feel comfortable having John return to PHS. Defendants, therefore, are basing the involuntary transfer not on the expert views of John's treating physician or their chosen psychologist, but on a vague expression of fear concerning a student with a mental health disability who is in treatment and poses no risk of harm. Acquiescing to such a stereotypical fear concerning amounts to discrimination on the basis of his disability. *Doe Decl.* ¶¶ 35-36.

9

# ARGUMENT

Plaintiff requests that this Court enter a temporary restraining order and preliminary injunction directing Defendants to continue educating John Doe as a member of the class of 2024 at Portland High School and permitting him to participate in cocurricular and extracurricular activities at that school, including the cross-country and track teams.

To obtain preliminary injunctive relief, Plaintiff must demonstrate:

(1) "a likelihood of success on the merits,

(2) a likelihood of irreparable harm absent interim relief,

(3) a balance of equities in the plaintiff's favor, and

(4) [that the injunction will be in] service of the public interest."

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements*, 794 F.3d 168, 171 (1st Cir. 2015) (citing *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011). Plaintiff as the moving party "bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## I.   PLAINTIFF IS PROVIDING NOTICE TO DEFENDANTS.

The Rules state that a temporary restraining order may be issued without written or oral notice to the adverse party or its attorney in certain circumstances. Fed. R. Civ. P. 65(b). The Rules are silent as to the applicable standard when notice has been provided. *See id.* Plaintiff is providing counsel

for Defendants with notice through provision of all the pleadings being filed with the Court. *O'Meara Decl.* ¶ 2. Plaintiff submits that this notice is sufficient and that a temporary restraining order either should be granted without a hearing or that a hearing should be scheduled as soon as possible.

## II.     PLAINTIFF LIKELY WILL PREVAIL ON THE MERITS.

Defendants' involuntary transfer of John Doe partway through his senior year at PHS violates his First Amendment right to free speech and amounts to disability discrimination based on stereotypes.

### A.     <u>The Involuntary Transfer Violates John's First Amendment Rights.</u>

Defendants' alleged basis for John's involuntary transfer consists only of off-campus speech in the form of private text messages to peers that later were forwarded to the school. The Supreme Court recently has addressed the ability of public schools to discipline students for off-campus speech. In *Mahanoy Area Sch. Dist., v. B.L.*, 141 S. Ct. 2038 (2021), the Court reversed discipline against an aspiring high school cheerleader who posted vulgar Snapchat messages expressing her disappointment in not being selected to the varsity squad and criticizing her school and coaches. The Court repeated the standard first enunciated in *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503 (1969), which permitted schools to regulate on-campus student speech that "materially disrupts classwork or involves substantial

11

disorder or invasion of the rights of others." *Id.* at 513. The Court went on, however, to note that in cases of off-campus speech, "the leeway the First Amendment grants to schools in light of their special characteristics is diminished." *Mahanoy*, 141 S. Ct. at 2046. With regard to off-campus speech, the Court explained that a school's interest in regulating off-campus speech applies only to "serious or severe bullying or harassment targeting particular individuals; threats aimed at teachers or other students; the failure to follow rules concerning lessons; the writing of papers, the use of computers, or participation in other online school activities; and breaches of school security devices, including material maintained within school computers." *Id.* at 2045.

Defendants have characterized John's text as threatening, but it does not contain a "true threat" as defined by the Supreme Court. A true threat is a "'serious expression' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman v. Colorado*, 143 S. Ct. 2106 (2023), quoting *Virginia v. Black,* 538 U.S. 343, 359 (2003). John's speech did not rise to the required level of severity or even convey an intent to harm. The most concerning portion of text—"With the increased risk of murder when around me, she is scared. I have shown her what I am capable of. I have given her ideas of what my free mind wants to do to her. With the sight of a pocket knife the last time I saw her, she is completely speechless"—does not state a direct threat to commit harm, much less a serious expression of an intent to

12

commit an act of violence. The statement, therefore, is not a true threat falling outside the boundaries of First Amendment protection.

Even if the statement could be classified as a true threat, Defendants' involuntary transfer still would violate the First Amendment. As the Supreme Court held this past term, the government may not sanction a true threat without a showing of *mens rea*. In *Counterman,* the Court held that liability or punishment for a "true threat" requires recklessness on the part of the speaker, "involving a 'deliberate decision to endanger another.'" *Counterman*, 143 S. Ct. at 2117, *quoting Voisine v. United States*, 579 U.S. 686, 694 (2016). The speaker may not be punished for his expression unless he was "aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Id.* (quoting *Elonis v. United States*, 575 U.S. 723, 746 (opinion of Alito, J.)). Unless the speaker has "consciously accepted a substantial risk of inflicting serious harm," the First Amendment treats the threatening speech as a "bad mistake" and prohibits sanctions. *Counterman*, 143 S. Ct. at 2118. Here, the evidence does not rise to the level of recklessness. Unlike in *Counterman*, where the defendant peppered the victim with a string of threatening electronic messages, John (a) sent his text message to a third-party, not the peer mentioned in the text, (b) did not realize that third-party would interpret it from a perspective different from his own and find it threatening, and (c) did not anticipate that the third-party

13

would share the message with others, including the school administration. *See Dr. Ostrander Declaration*, ¶ 9. Without evidence that John consciously accepted a substantial risk of inflicting serious harm on the female peer through his text message, the First Amendment protects him from being sanctioned for his speech. John is therefore likely to prevail on his claim that Defendants' involuntary transfer determination violates his constitutional rights and must be nullified.

### B. The Involuntary Transfer Violates John's Right to Be Free from Discrimination Based on His Disability.

The First Circuit has acknowledged that the ADA is designed to protect individuals with disabilities from discriminatory "action based on stereotypes and fear." *EEOC v. Amego, Inc.*, 110 F.3d 135 (1st Cir. 1997), *citing* H.R. Rep. No. 101–485, pt. 3, at 45 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 468. Both the ADA and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibit disability discrimination "not just based on invidious 'affirmative animus,' but also based on thoughtlessness, apathy and stereotypes about disabled persons." *Guckenberger v. Boston University,* 974 F. Supp. 106, 134 (D. Mass. 1997) ("Congress has found that individuals with disabilities are a 'discrete and insular minority' who have been faced with restrictions and limitations 'resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to,

14

society.' 42 U.S.C. § 12101(a)(7)."). *See also School Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 284 (1987) ("the basic purpose of § 504 . . . is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others.").

In a case like this, challenging the involuntary transfer of a student with a disability due to expressions of fear or discomfort, the Court must be "mindful of the ADA and Rehabilitation Act's goals of eliminating discrimination against individuals with disabilities and protecting those individuals 'from deprivations based on prejudice, stereotypes, or unfounded fear.'" *New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 304 (3d Cir. 2007), *quoting Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 737 (9th Cir. 1999) ("'it is not enough that individuals pose a hypothetical or presumed risk'—the evidence must reflect a risk that is significant and harm that is serious.").

In this case, there is no evidence that John presents a risk of harm to other PHS students or PHS staff. His treating physician has stated as much and urged Defendants to get him back into his school routine and back with his peer supports on the cross-country and track teams at PHS. Defendants' psychological assessment, which has extended John's time out of school, provides no contrary data. PHS is the only high school John has attended and competed for in athletics, and returning him there would have therapeutic

15

benefits. Defendant Portland, however, has ordered his involuntary transfer in response to a stereotypical expression of fear and discomfort by a small group of students at PHS. John continues to be in treatment and poses no risk of harm, so such stereotypical fears of a student regarded as having a mental health disability cannot serve as a legitimate basis for Portland's actions under the ADA and section 504.

### III. PLAINTIFF WILL SUFFER IRREPARABLE INJURY UNLESS THE COURT GRANTS INJUNCTIVE RELIEF.

Irreparable harm is a substantial injury that is not accurately measurable or adequately compensable by money damages. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). In *Brown v. Board of Education*, 347 U.S. 483 (1954), the Supreme Court explained that "education is perhaps the most important function of state and local governments . . . It is required in the performance of our most basic public responsibilities . . . it is the very foundation of good citizenship." *Id.* at 493. The loss of educational opportunity is an injury not compensable by money damages. Its loss, therefore, is irreparable in the legal sense.

Courts have held that deprivation of educational opportunities inflicts harm that cannot be remedied by money damages. *See, e.g., Johnson v. Collins*, 233 F. Supp. 2d 241, 251 (D.N.H. 2002) ("I find that the Johnsons have made an adequate showing that Andrew is likely to suffer irreparable

16

harm absent injunctive relief if he continues to be deprived of an education during the pendency of this lawsuit"); *Murphy v. Fort Worth Independent School Dist.*, 258 F. Supp. 2d 569, 575 (N.D. Tex.) ("No form of compensation is available to [plaintiff] for the injury he would suffer if he were not to be returned in his home school for the continuation of his education"), *vacated on other grounds*, 334 F.3d 470 (5th Cir. 2003).

      In this case, if injunctive relief is not issued promptly, John Doe will be involuntarily forced to sever his relationship with PHS, the only high school he has attended and competed for, midway through the first semester of his senior year. The evidence makes clear that John is committed to PHS; his school friends and teammates at PHS comprise his social circle and support group. He has worked hard to craft an academic schedule at PHS that would permit him to earn the credits needed for graduation, capture all the prerequisites for the college programming he seeks to pursue, complete his carpentry certification at PATHS, and continue to compete at a high level for the PHS cross-country team (of which he is a captain) and track teams. If the Court fails to enjoin Portland's involuntary transfer of John, then his college recruitment efforts also will be needlessly interrupted and damaged, as he undoubtedly will have to explain why he no longer attends or competes for PHS. In addition, John's treating physician has stressed the need for him to return to his academic and athletic routine at PHS as soon as possible for

17

therapeutic reasons. Transferring him to a different school is likely to damage not only his twelfth-grade experience and college recruiting, but also cause further irreparable injury in the form of adverse effects on his mental health.

There is no adequate legal remedy to compensate for the wide range of harms that would flow from Defendants' involuntary transfer order. The Court should find that Plaintiff has sufficiently proved irreparable harm sufficient for the issuance of injunctive relief.

## IV. THE INJURY TO PLAINTIFF IN THE ABSENCE OF A PRELIMINARY INJUNCTION OUTWEIGHS ANY HARM TO DEFENDANT.

This Court must weigh the balance of equities, which is "whether the harm caused plaintiff without the injunction, in light of the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants." *Vargas-Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir. 1987).

As described above, the harm to Plaintiff in the absence of injunctive relief would be severe. It would mark a termination of his programming and affiliation with PHS during his senior year, needlessly damage his college recruiting opportunities, and place his mental health at risk. Little if any harm, however, would befall Defendants were John to return to PHS, just as Portland administrators had routinely promised John and his mother

throughout the past month of assessments and delays. This is true because (a) John poses no risk of harm to students or staff at PHS, (b) he has agreed to abide by the terms of the District Court's stipulated protection from harassment order and the recommendations in Portland's psychological report, and (c) the return to PHS promises to have therapeutic benefits for John, ameliorating the effects of his mental health disability. Because the balance of equities tips strongly in John's favor, injunctive relief should be granted.

## V. GRANTING THIS TEMPORARY RESTRAINING ORDER SERVES THE PUBLIC INTEREST.

"The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief." *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005).

Here the public interest weighs in favor of requiring Defendants to (a) honor John's First Amendment right to free speech, (b) comply with the ADA and section 504 by not acquiescing to stereotypical fears concerning a student with a mental health disability who is in treatment and presents no risk to others, and (3) respect the public process developed by the school district by which Portland residents select a high school. There is no public interest that supports denial of injunctive relief in this case.

19

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant her motion for temporary restraining order and preliminary injunctive relief requiring Defendants to maintain the status quo by permitting John to return immediately to his academic and athletic activities at PHS, notwithstanding Portland's unlawful involuntary transfer order.

Dated:  October 30, 2023.              Respectfully submitted,

/s/ Richard L. O'Meara
Richard L. O'Meara
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651
E-mail:  romeara@mpmlaw.com


/s/ Ellen P. Masalsky
Ellen P. Masalsky
MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651
E-mail:  emasalsky@mpmlaw.com

Counsel for Plaintiff Ms. Doe