UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| MS. DOE, on behalf of her minor son, JOHN DOE | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2:23-cv-00409-JAW |
| PORTLAND PUBLIC SCHOOLS, et al, | ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON MOTION FOR A TEMPORARY RESTRAINING ORDER**

A mother, on behalf of her minor son, moves the Court for a temporary restraining order to maintain the son's placement at his current high school, alleging the school district, by mandating his transfer to another local high school, is discriminating against the son because of his disability and violating his First Amendment right to free speech.  In addition, the mother requests that the Court urgently consider her demand that the Court enjoin the Defendants and require them to include her son's name on the roster of school athletes competing in the New England Cross Country meet.

The Court concludes the mother is unlikely to succeed on the merits on her First Amendment claim because although the son's speech occurred off campus, his First Amendment rights must give way to the school district's need to prevent further disruption of learning-related activities and to protect others in the school community—particularly teenage females on campus.  The Court also concludes that the mother is unlikely to succeed on either of her disability discrimination claims

because the record does not indicate the son's disability diagnoses were the but-for or animating cause of the school district's decision to transfer the son to another local high school.   The Court further concludes that the mother has failed to carry her burden of demonstrating that the son will suffer irreparable harm absent a temporary restraining order because the record suggests the son will be able to graduate on time, and an inability to participate in interscholastic athletics and the attendant loss of college recruiting opportunities does not constitute irreparable harm.   Lastly, the Court concludes that both the balance of the equities and the public interest weight in favor of the school district as their decision helps ensure the safety and well-being of numerous community members, including the son.   The Court, therefore, holds that the mother failed to meet the high burden required for the extraordinary remedy of a temporary restraining order and accordingly denies the motion seeking it.

## I.      PROCEDURAL BACKGROUND

On October 30, 2023, Ms. Doe, on behalf of her minor son, John Doe, filed a complaint against Portland Public Schools (PPS), as well as PPS' superintendent Dr. Ryan Scallon and deputy superintendent Aaron Townsend.  *Compl.* (ECF No. 1).  Ms. Doe's complaint brought forth 1) a claim pursuant to 42 U.S.C. § 1983, that PPS violated John Doe's First Amendment rights, 2) a claim pursuant to 29 U.S.C. § 749, that PPS engaged in intentional discrimination against John Doe due to his disability in violation of section 504 of the Rehabilitation Act of 1973, and 3) a claim pursuant

to 42 U.S.C. § 12132, that PPS intentionally discriminated against John due to his disability in violation of Title II of the American with Disabilities Act. *Id.*

Also on October 30, 2023, Ms. Doe filed a Motion for Temporary Restraining Order and Preliminary Injunction, *Mot. for Temp. Restraining Order and Prelim. Inj.* (ECF No. 4) (*Pl.'s Mot.*),[1] requesting that the Court require PPS "to maintain the status quo by permitting John to return immediately to his academic and athletic activities at [Portland High School], notwithstanding [PPS'] unlawful involuntary transfer order." *Id.* at 20.

The following day, October 31, 2023, following attorney appearances for PPS, the Court held a hearing on the pending motion for temporary restraining order (TRO) wherein counsel agreed to an expedited briefing schedule. *Hearing* (ECF No. 9).[2] On November 1, 2023, PPS responded in opposition. *Defs.' Opp. to Emergency Mot. for a Temp. Restraining Order* (ECF No. 12) (*Defs.' Opp'n*). On November 2,

---

[1]    As the Court explained during the October 31, 2023 telephone conference of counsel, Federal Rule of Civil Procedure 65(b) addresses motions for TROs as if they have been filed on an ex parte basis. FED. R. CIV. P. 65(b)(1) ("The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney if . . . ."). Here, as counsel for the Defendants has received notice and entered their appearance, this procedure is something of a hybrid between a motion for TRO and for preliminary injunction. Nevertheless, as the Plaintiff expressly requested the Court to act quickly on the requested relief, the Court is treating this motion as a request for a TRO and will address the next steps, including disposition of the motion for preliminary injunction, with counsel at the telephone conference scheduled for Monday, November 6, 2023.

[2]    During the October 31, 2023 telephonic conference of counsel, counsel for the Plaintiff requested a temporary restraining order to allow John Doe to participate in the Maine State Cross-Country meet, which is scheduled for November 4, 2023. Following the conference of counsel, and upon learning that the deadline for including John on the list of runners from Portland High School had already passed, the Plaintiff decided to instead seek a temporary restraining order to allow John to participate in the New England Championships, which are scheduled for November 11, 2023. The Court thus adjudicates this TRO in a timely fashion so that the parties will know the Court's ruling before the registration deadline for the New England Championships.

2023, Ms. Doe replied.  *Reply to Mot. re Mot. for Temporary Restraining Order and Preliminary Injunction* (ECF No. 13) (*Pl.'s Reply*).

## II.   FACTUAL BACKGROUND

John Doe is a seventeen-year-old twelfth-grade student at Portland High School (PHS), where he is a member of the National Honor Society and maintains a GPA of 97.  *Pl.'s Mot.* at 2.  John has been enrolled at PHS throughout high school and competes on multiple varsity teams.  *Id.*  He has earned the position of senior captain on the boy's cross-country team and run as part of the PHS track team at the New England Championships several times in multiple events.  *Id.*  He has competed twice at the National Championships for the 4x800 relay team.  *Id.*  "Given his academic and athletic strengths, John is currently being recruited by several colleges and universities."  *Id.* at 3.  "John also participates in the carpentry program at the Portland Arts and Technology High School (PATHS) for half of each school day," having earned a gold medal in carpentry at the 2023 Maine Skills USA Leadership and Skills Competition.  *Id.*

John, however, has been unable to continue his schooling and athletic career at PHS and his carpentry program at PATHS due to some of his behavior.  In early February 2023, one of John's friends provided a PHS social worker with a screen shot of a text message in which John had written, among other things, "Watch bro. I will become the greatest to ever, or if all goes wrong you'll see me on the news for mass murder and rape. It seems like I'm joking, but trust me I'm not. Watch."  *Defs.' Opp'n* at 2.  Later that month and into March and April, a friend of John's shared text

messages authored by John and conveying John's obsession with one of his female classmates, stating "I have been obsessed with her for months," "I can't stop looking at her location," "I could put [female Student 1] out there on my snapchat story when I rape her." *Id.* On May 11 2023, "John posted a picture from prom on Instagram showing him getting into a car with his face photoshopped with half a face of an angel and half a face of a devil and blood spattered on his car." *Id.*, Attach.1, *Decl. of Aaron Townsend* ¶ 15 (*Townsend Decl.*). On May 19, 2023, John sent two music videos to a female classmate, "one about a boy killing his girlfriend and one about killing cats." *Id.* "PHS staff attempted to address each of the incidents by communicating with Ms. Doe, providing support to John, and trying to connect John with counselling." *Defs.' Opp'n* at 2; *see also Townsend Decl.* ¶ 16.

Since August 2, 2023 "John has been in regular treatment with the Maine Medical Center Outpatient Child/Adolescent Psychiatry unit" and "has been diagnosed with Prolonged Grief Disorder and Major Depressive Disorder, Recurrent, Mild." *Pl.'s Mot.*, Attach.2, *Declaration of Robyn L. Ostrander, M.D. in Support of Pl.'s Mot. for Temp. Restraining Order and Prelim. Inj.* ¶ 4 (*Ostrander Decl.*).

In late August 2023, John sent to a peer a "lengthy sexualized text message" which he had composed and sent to another peer in June 2023. *Pl.'s Mot.* at 4. "The text referenced (but was not sent to) a female peer and described her as the object of his sexual desire." *Id.* In one passage it stated: "With the increased risk of murder when around me, she is scared. I have shown her what I an[sic] capable of. I have given her ideas of what my free mind wants to do to her. With the sign of a pocket

knife the last time I saw her, she is completely speechless." *Defs.' Opp'n* at 3. Ms. Doe avers "John mistakenly had a utility knife from his PATHS carpentry program in his bag at one of the spring track practices." *Pl.'s Reply* at 2. Regardless, the friend provided administrators at PHS with a copy of the message on September 22, 2023. *Defs.' Opp'n* at 2-3. This message was also "displayed on a phone and passed around a class by students so that it was viewed by every student in the room" and later "shared between students during the school day". *Id.*, Attach.11, *Decl. of Sarah Obare* ¶¶ 4-5 (*Obare Decl.*).

Given the contents of the message, the PHS administration decided to suspend John "in compliance with [the PPS Board Policy on Suspension of Students]," "because they believed that doing so was necessary for the safety, health, and wellbeing of John and the school community, and to give them time to accurately assess the risk that John posed to the school." *Defs.' Opp'n* at 3 (internal citations omitted).

"[I]mmediately after John was suspended on September 22", he sent a voice memo to another student. *Pl.'s Reply* at 1-2. In the four-minute voice memo, John "indicated he knew he was not to be contacting her and stated that he should kill himself." *Defs.' Opp'n* at 5. That same day, John showed up for the bus to go to the school's cross-country meet and had to be told by the coach that he could not attend. *Defs.' Opp'n,* Attach. 11 ¶ 13.[3]

---

[3]     Ms. Doe and PPS contest whether it was made clear to the Does that John was also suspended from co-curricular activities including cross-country. *Obare Decl.* ¶ *13; Pl.'s Reply, Attach. 1, Reply Decl. of Ms. Doe in Support of Pl.'s Mot. for Temp. Restraining Order and Prelim. Inj.* ¶ *5(g) (Reply Doe Decl.).*

Several students then spoke to Assistant Principal Obare about their concerns about John and others spoke with other administrators. *Obare Decl.* ¶ 6. Other students have expressed concern about John harming himself, harming others, and failing to respect boundaries with female students as exemplified by him repeatedly saying things like "I know where you live" or "I can find where you live" as well as repeatedly calling and contacting them, at times discussing sexual material. *Id.* ¶¶ 7-10. "A total of five female students have requested that the school prohibit John from having contact with them." *Id.* ¶ 11.

"The first step for the school was to perform a Comprehensive School Threat Assessment Guidelines ('CSTAG') threat assessment." *Defs.' Opp'n* at 3. "A Portland social worker conducted the assessment" and "both Ms. Doe and John participated." *Pl.'s Mot.* at 5. During the interviews, PHS administrators learned of other "troubling" communications, including "messages sent by John wanting students to be hurt," "a message saying that [another student] needed to 'be humbled,'" a message to another male student "referencing a group of girls that stated 'You're a big strong dude. Imagine what you could do to those girls over there.'" *Defs.' Opp'n* at 3-4 (internal citations omitted). The administration "also learned that the PHS cross-country coach did not want John on his team due to John's sexually harassing behavior and threats toward female team members." *Id.* at 4.

Although "PHS's principal informed the Does that upon completion of the assessment and review by the administrators on September 27, John would be able to return to PHS the following day," the "principal called Ms. Doe on September 28

to request a meeting with her and Portland's social worker. At the meeting, the principal requested more time to develop the steps for John's re-entry to PHS." *Pl.'s Mot.* at 5. More time was needed because under the CSTAG criteria, "evaluators determined that John posed a 'very serious substantive risk,' the highest category of threat under the CSTAG criteria," *Defs.' Opp'n* at 4, and "PPS felt as though it could not rule out whether John posed a significant risk to the PHS community and himself," *id.* Ms. Doe "never received the results of the CSTAG." *Pl.'s Reply* at 2. Nonetheless, the parties then "agreed to meet again on October 4 to go over the points of a proposed re-entry plan so John could get back to PHS." *Id.*

"At the meeting on October 4, Defendant Townsend, the Deputy Superintendent, joined the principal" and "requested a second assessment of John by a psychologist before permitting him to return to PHS," *Pl.'s Mot.* at 5, which Ms. Doe agreed to, *Defs.' Opp'n* at 4. PPS required John to remain "out of school for several days," *Pl.'s Mot.* at 5, until "Dr. Moran completed the risk assessment on October 19, 2023," *Defs.' Opp'n* at 4. "Meanwhile, John participated in private therapy and completed his PHS school work through tutorials." *Pl.'s Mot.* at 5.

John was barred, however, from his carpentry classes at PATHS and from participating in athletics. As a result, he was unable to participate in the Cross-Country Regional Championships on October 21, 2023." *Pl.'s Mot.* at 5. PPS also omitted John from the state championship roster submitted in mid-October while John was undergoing the risk assessment, rendering it impossible that he run at the November 4, 2023 meet. *Pl.'s Reply* at 3.

Aware of John's June 2023 text message which he resent in August 2023, as well as his other texts and the blood-splatter and devil face collage created by John in Spring 2023, and having discussed the June 2023 message with John, his private psychiatrist, Dr. Robyn L. Ostrander believes John was feeling lonely and unseen and needed to be recognized. *Ostrander Decl.* ¶ 9. She further believes it is "important for the continuation of John's therapeutic progress that [his] relationships and activities be restored to his life as soon as possible. *Id.* ¶ 11. Ultimately, Dr. Ostrander "encouraged Portland to permit him to continue his education at PHS and get back to his friends and athletics." *Pl.'s Mot.* at 6.

During his assessment with Dr. Moran, the psychologist designated by PPS to perform John's risk assessment, John "acknowledged that he was having occasional thoughts of raping a girl and of killing her. However, he said that he had no plans to act on these thoughts." *Defs.' Opp'n*, Attach. 7, *Psychological Evaluation* at 3. John went on to say that "he currently has occasional negative sexual thoughts, but no plan to act on them" and then again said "I still have intrusive thoughts of raping someone sometimes, but no plans." *Id.* One of Dr. Moran's tests suggests that John "responded to items in a highly guarded and defensive fashion." *Id.* In his assessment, Dr. Moran ultimately deferred to the judgment of PHS staff but made recommendations that John continue to engage in community-based therapy, meet weekly with the PHS social worker, understand expectations prior to returning to school, prepare for negative comments that may be made by peers, learn to control his negative thoughts, learn healthy coping skills, and develop a positive self-image.

*Defs.' Opp'n* at 4; *Pl.'s Mot.* at 6-7.   John has "agreed to abide by all of the recommendations set forth in the psychological assessment report." *Pl.'s Mot.* at 7.

While this counseling and assessment was underway, proceedings were simultaneously underway before the state of Maine District Court, after the mother of the female peer named in John's text filed a complaint seeking protection from harassment by John. *Sealed Additional Attachs.*, Attach. 3, *(Order for Protection from Harassment)*. On October 20, 2023, the proceedings ended with issuance of a stipulated order seen and agreed to by both parties. *Id.* "Under the terms of the court's stipulated order, John was cleared to return to school and athletics at PHS with conditions, including refraining from physical and electronic contact with the female peer and not attending team dinners that involve both the boys' and girls' teams." *Pl.'s Mot.* at 7-8.

The day after Dr. Moran completed his assessment and the same day the Court issued its stipulated order, October 20, 2023, PHS administration received information that John had sent a girl on the cross-country team the four-minute voice memo described above talking about killing himself and that John shared TikTok videos depicting a female student in a bikini with a friend via text, which then circulated around the PHS cross-country team. *Defs.' Opp'n* at 5; *Pl.'s Reply*, Attach. 1, *Reply Decl. of Ms. Doe in Support of Pl.'s Mot. for Temp. Restraining Order and Prelim. Inj.* ¶¶ 5(b)-(c) *(Reply Doe Decl.)*. This TikTok video was created on September 9, 2023. *Id.*

At that point, "PPS determined that it was in the best interests of John and the entire PHS community that John return to a different high school in the District." *Defs.' Opp'n* at 5.  PPS does not mean for the transfer to be disciplinary, will not record the transfer in John's student record as discipline, and instead believes it is "intended to facilitate John's re-entry into school and give him a fresh start at a different school" as "it is not in John's best interest to return to PHS this year because information and misinformation about John is so widespread." *Id.*; *see also Defs.' Townsend Decl.* ¶ 35.  "The PHS administration likewise believes that the plan serves the best interests of students at PHS, many of whom have exhibited real fear and anxiety because of what John has written." *Defs.' Opp'n* at 5.  "PHS administration also considered its ability to meet its obligation to protect students—in the circumstances here, female students—from sexually harassing conduct in light of John's continued contact with females at PHS even after expressing an understanding that he should not engage in such contact." *Id.*

Given all of this, "PPS worked with Casco Bay [High School] to put together a schedule and re-entry plan for John; and provided with the option for John to attend Deering High School as well." *Id.*  "PPS is confident that John will receive comparable instruction at any of the Portland high schools, and, although John's cross-country coach at PHS indicated that John should not be on the PHS team, John's re-entry plan will enable him to join the running team at Deering High School." *Id.* at 5-6. PPS issued this re-entry, or return to school, plan on October 25, 2023. *Pl.'s Mot.*,

Attach. 1, *Decl. of Ms. Doe in Support of Pl.'s Mot. for Temp. Restraining Order and Prelim. Inj.* ¶ 30 (*Doe Decl.*).

Ms. Doe believes this "amounts to an involuntary transfer" as it prohibits John from taking classes or competing in athletics for PHS. *Pl.'s Mot.* at 8. While John will not be able to run on November 4, 2023, Ms. Doe remains hopeful he will be able to run at the New England championship meet to be held on Saturday, November 11, 2023. *Reply Doe Decl.* ¶ 3. To do so, however, PPS would need to add John to the roster for this event by this Sunday, November 5, 2023. *Id.* If successful at the New England championship meet, the PHS cross-country team would be invited to the Nationals cross-country meet, a goal of John's. *Id.* ¶ 4. Ms. Doe, therefore, requests a temporary restraining order to compel PPS to allow John to restart his athletic eligibility and academic programming at PHS and PATHS.

## III.   THE PARTIES' POSITIONS

### A.   Ms. Doe's Motion for TRO

Ms. Doe seeks a TRO pursuant to Federal Rule of Civil Procedure 65 to "stop [PPS]] plan to transfer her son, John Doe, involuntarily to a different high school," *Pl.'s Mot.* at 1, and to require PPS to permit "John to return immediately to his academic and athletic activities at [Portland High School], notwithstanding Portland's unlawful involuntary transfer order." *Id.* at 20. Ms. Doe contends the order is unlawful because it "violates John's First Amendment right to free speech and amounts to discrimination on the basis of disability." *Id.* at 1. Ms. Doe notes she bears the burden of establishing that each of the four factors for preliminary

injunctive relief weighs in her favor, *id.* at 10, and she asserts they all do.  *Id.* at 11-19.

Beginning with the likelihood of success on the merits on the First Amendment right to free speech claim, Ms. Doe argues PPS' "alleged basis for John's involuntary transfer consists only of off-campus speech in the form of private text messages to peers that later were forwarded to the school." *Id.* at 11.  John's speech happening off-campus, Ms. Doe contends, limits the school's interest in regulating it.  *Id.* at 11-12.  Ms. Doe also contends that John's text "does not contain a 'true threat' as defined by the Supreme Court" because "John's speech did not rise to the required level of severity or even convey an intent to harm." *Id.* at 12.   Pointing to the "most concerning portion of text," Ms. Doe asserts it "does not state a direct threat to commit harm, much less a serious expression of an intent to commit an act of violence." *Id.* at 12-13.

"Even if the statement could be classified as a true threat," Ms. Doe argues, PPS' "involuntary transfer would still violate the First Amendment" because "the government may not sanction a true threat without a showing of *mens rea*." *Id.* at 13.  Believing there to be no evidence "that John consciously accepted a substantial risk of inflicting serious harm on the female peer through his text message," Ms. Doe contends John is protected by the First Amendment from being sanctioned for his speech. *Id.* at 14.

Ms. Doe then argues that the "involuntary transfer violates John's right to be free from discrimination based on his disability" as protected by both the ADA and

Section 504 of the Rehabilitation Act. *Id.* Ms. Doe contends "there is no evidence that John presents a risk of harm to other PHS students or PHS staff," that his "treating physician has stated as much and urged [PPS] to get him back to his school routine and back with his peer supports on the cross-country and track teams at PHS." *Id.* at 15. Ms. Doe concludes by saying that "John continues to be in treatment and poses no risk of harm, so such stereotypical fears of a student regarded as having a mental health disability cannot serve as a legitimate basis for Portland's actions." *Id.* at 16.

Regarding the second factor, likelihood of irreparable harm, Ms. Doe argues that absent prompt injunctive relief, John will be deprived of educational opportunities, "involuntarily forced to sever his relationships with PHS," have "his college recruitment efforts . . . be needlessly interrupted and damaged, as he undoubtedly will have to explain why he no longer attends or competes for PHS," and endure "further irreparable injury in the form of adverse effects on his mental health." *Id.* at 16-18.

With respect to the third factor, the balance of equities, Ms. Doe argues "the harm to [John] in the absence of injunctive relief would be severe" while "[l]ittle if any harm" "would befall [PPS] were John to return to PHS, just as Portland administrators had routinely promised John and his mother." *Id.* at 18.

Concerning the fourth factor, whether the injunction serves the public interest, Ms. Doe contends "the public interest weighs in favor of requiring [PPS] to (a) (a) honor John's First Amendment right to free speech, (b) comply with the ADA and

section 504 by not acquiescing to stereotypical fears concerning a student with a mental health disability who is in treatment and presents no risk to others, and (3) respect the public process developed by the school district by which Portland residents select a high school." *Id.* at 19.  Meanwhile, Ms. Doe asserts "[t]here is no public interest that supports denial of injunctive relief in this case." *Id.*

## B.   Portland Public Schools' Opposition

In response, Portland Public Schools contends the "Court should not exercise its extraordinary injunctive power to substitute its judgment for the judgment of experienced, school administrators about the best educational and safety interests of PPS students." *Def.'s Opp'n* at 1.  PPS argues that the record "reveals that, based on all the information made known to school officials, PPS's re-entry plan for John is eminently reasonable in light of all students' interests, including those of John." *Id.* at 2.

### 1.   Likelihood of Success on the Merits

PPS maintains that because Ms. Doe "has failed to show a substantial likelihood of success on the merits and because all other remaining factors compel denial of [her] requested relief, this Court must deny [her] request for a preliminary injunction and temporary restraining order." *Id.* at 20.

To start with, PPS argues Ms. Doe's First Amendment challenge will fail on the merits. *Id.* at 6-14.  First, PPS claims Ms. Doe's legal argument "grossly oversimplifies the nexus between the PHS community and John's speech," "overlooks the other relevant facts known to PPS as well as [PPS's] practical obligation to act

proactively to protect the entire PHS community." *Id.* at 7.  Second, PPS argues "the First Amendment gives leeway for schools to regulate the speech at issue here, which was in the form of text messages that constituted harassment and threats aimed at specific individuals.  Contrary to Plaintiff's argument, this leeway remains true regardless of whether the speech here occurred on campus or off." *Id.*  PPS continues, arguing that "because written statements can be regulated by the school under *Tinker*, Plaintiff's arguments regarding true threats are inapposite." *Id.* (referencing *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503 (1969)).

Even if *Tinker* controls, PPS argues, any regulation of John Doe's speech was permissible because "there was actual disruption on school premises," it was "reasonable—and arguably obligatory—for school officials to anticipate a disruption," and "John Doe's text messages invaded the rights of other students 'to be secure and to be let alone.'" *Id* at 9-10 (quoting *Tinker*, 393 U.S. at 508).  Moreover, PPS contends, the "disruptions and invasions on the rights of other students were caused by John sending these text messages to other students" and PPS' response was "eminently reasonable in light of the information known to the school administrators." *Id.* at 11.

Parsing the argument even further, PPS argues that even if the Court found John Doe's speech was off-campus speech, the speech at issue here qualifies as "serious or severe bullying or harassment targeting particular individuals and "threats aimed at teachers or other students," *Mahanoy*, 141 S. Ct. at 2045, therefore qualifying as "speech for which schools maintain their ability to regulate student

speech even if it was "off-campus." *Defs.' Opp'n* at 12 (citing *Doe v. Hopkinton Pub. Sch.*, 19 F.4th 493, 505-06 (1st Cir. 2021) ("The Supreme Court made clear in Mahanoy . . . that schools have a significant interest in regulating 'serious or severe bullying or harassment' that invades the rights of others . . . . This pedagogical interest remains even in off-campus circumstances.")).

PPS turns to Ms. Doe's ADA and Rehabilitation Act claims and argues they similarly will not succeed on the merits.  To succeed under either act, a plaintiff must "show that his or her disability is the cause of his alleged exclusion from a program or service." *Def.'s Opp'n* at 15 (citing 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, <u>by reason of such disability</u>, be excluded from participation in or be denied the benefit of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.") and 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, <u>solely by reason of her or his disability</u>, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .")) (emphasis in *Def.'s Opp'n*).  PPS contends that plaintiff cannot establish John's disability was the but-for cause of the involuntary school transfer because "the evidence makes plain that . . . PPS's actions have been in response to John's conduct and the [Comprehensive School Threat Assessment Guidelines] threat evaluation, not based on or even in response to John's disability." *Def.'s Opp'n* at 17.

To buttress this claim, PPS points to John's actions since February 2023, which include:

text messages to fellow students alluding to committing to "mass murder and rape," Townsend Decl. ¶ 15; describing plans to commit sexual violence against an identified female student, Townsend Decl., ¶ 15; taken a knife with him to track practice, Townsend Decl. ¶ 18; harassed female students, including female cross country team members, Townsend Decl. ¶ 20; Obare Decl. ¶ 11; and circulated a lengthy text message graphically narrating a fantasy of sexual violence against a female classmate, and describing an "increased risk of murder around" himself, Townsend Decl., Ex. 5."

*Defs.' Opp'n* at 17-18.  PPS points to the fact that "PHS suspended and performed a threat assessment on John in September 2023, in response to this concerning conduct, before it even learned of John's diagnoses in October," *Id.* at 18 (internal citations omitted), and argues that Ms. Doe "has not and cannot proffer any evidence that any non-disabled student who engaged in such conduct would have been treated differently than John has been and is being treated." *Id.*  Lastly, PPS argues that the evidence belies Ms. Doe's assertion that John's transfer was in response to a stereotypical expression of fear and discomfort by a small group of students.  *Id.*  Instead, PPS contends, the transfer is in response to "student's concerns based on John's concrete actions and threats, not an abstract or stereotype view of his mental health struggles or diagnoses," in conjunction with "school administrators' and Dr. Moran's independent analysis of John's actions and needs in order to move forward as part of the PPS community."  *Id.*

## 2.   Likelihood of Irreparable Harm

PPS argues that disruptions to John Doe's athletic schedule "does not constitute irreparable harm."  *Id.* at 19 (quoting *Dziewa v. Penn. Interscholastic Athletic Ass'n, Inc.*, No. CIV.A. 08-5792, 2009 WL 113419, at *7 (E.D. Pa. Jan. 16,

2009) and citing *Sisson v. Va. High Sch. League, Inc.*, No. 7:10CV00530, 2010 WL 5173264, at *4 (W.D. Va. Dec. 14, 2010) and *S.B. ex rel. Brown v. Ballard Cty. Bd. of Educ.*, 780 F. Supp. 2d 560, 569 (W.D. Ken. 2011)).

PPS then argues Ms. Doe's failure to identify any concrete college recruitment or collage opportunities that would be impacted by John's transfer make that potential harm too speculative and therefore "not the kind of harm that preliminary injunctions were fashioned to address." *Id.* (quoting *Dziewa*, 2009 WL 113419, at *7).

PPS disputes that John's transfer will damage his twelfth-grade experience because "courts 'routinely hold that a student suffers no irreparable harm where the [school district] provides an alternative educational option and where the student can stay on track to graduate.'" *Id.* (citing *McKinney ex rel. K.P. v. Huntsville Sch. Dist.*, 350 F. Supp. 3d 757, 771 (W.D. Ark. 2018) (collecting cases)). PPS contends, to the contrary, that "a transfer to Casco Bay High School would likely benefit John's academic studies, because PHS's social environment is so saturated with rumors about John (both true and false) that are disruptive and distracting to John's schoolwork." *Id.* at 20.

### 3. Balance of the Equities

PPS does not explicitly address the balance of the equities other than in its introduction and conclusion. However, from these references the Court gleans PPS's contention that the interests to be balanced are those of John Doe and the "safety and education of *all* students." *Id.* at 1 (emphasis in original). *See also id.* at 20 ("PPS is steadfast in its commitment to delivering a safe and stable learning environment for

all students while simultaneously balancing its obligation to protect the rights of all students").

### 4.   Public Interest

PPS disputes Ms. Doe's assertion that there is "no public interest that supports denial of injunctive relief in this case."  See *id.* at 20.  It posits that Ms. Doe "ignores the interests of the entire PHS community, which includes both students and staff, who have been spending significant time and resources away from instructional time to manage students' reactions and concerns about John," *id.*, and that "[t]he students at PHS who have been the subject or recipient of John's explicit threats of violence, including sexual violence targeted at specific female students, will feel unsafe if he is allowed to return to PHS."  *Id.*

### C.   Ms. Doe's Reply

First, Ms. Doe argues the case continues to warrant urgent consideration and entry of a temporary restraining order because the roster submission deadline for the New England championship meet to be held on November 11, 2023 is this Sunday, November 5, 2023.  *Pl.'s Reply* at 3.  Since PPS has no intention of adding John to the roster, Ms. Doe asks the Court to compel them to do so.  *Id.*

Ms. Doe maintains she is likely to prevail on the merits.  *Id.* She takes issue with PPS's position, as Ms. Doe articulates it, that "having an administrator say that John's off-campus speech requires his voluntary transfer because it would support the 'safety, health and well-being of John and the school munity,' means no First Amendment analysis is necessary."  *Id.* at 3-4.  Ms. Doe disagrees, "emphasizing that

all of John Doe's 'behavior' in this case is in the form of off-campus speech," *id.* at 4, diminishing "the leeway the First Amendment grants to schools to regulate speech." *Id.* (citing *Mahanoy*, 141 S. Ct. at 2046). Therefore, John should "retain a right to speak free of government interference or sanction unless that speech runs afoul of the test recently set forth in *Mahanoy Area Sch. Dist., v. B.L.*, 141 S. Ct. 2038 (2021)." *Id.*

Instead of applying the *Tinker* "on-campus speech test" that "does not apply," Ms. Doe contends PPS must "justify its involuntary transfer of John by proving 'serious or severe bullying or harassment targeting particular individuals' or 'threats aimed at teachers or other students.'" *Id.* (citing *Mahanoy*, 141 S. Ct. at 2045). Ms. Doe does not believe PPS can do so, and says PPS is "dredging up" off-campus speech to sanction John, thereby violating his First Amendment rights. *Id.* at 4-5.

Ms. Doe also finds PPS's arguments that they can transfer John under the *Tinker* test unavailing, taking issue with Ms. Doe citing two "on-campus speech" cases that predate *Mahanoy*. *Id.* at 5 (referring to *Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12 (1st Cir. 2020) and *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir. 2001)). Ms. Doe contends "[t]hese cases are not relevant to John's off-campus speech and do not control in this case." *Id.* Instead, the "test set forth in Mahanoy is the appropriate standard." *Id.* Under this *Mahanoy* test, John's speech "which does not rise to the level of a true threat" should be considered protected speech. *Id.* (citing *Counterman v. Colorado*, 143 S. Ct. 2106 (2023) (finding that a true threat is a

"serious expression conveying that a speaker means to commit an act of unlawful violence")).

Ms. Doe then argues John would suffer irreparable injury because "[i]nvoluntary transferring John from PHS would cause him to miss out on [his goal of competing in the cross-country National meet] and impact his college recruiting prospects." *Id.* at 6.  Moreover, "transferring in the middle of his senior year would undoubtably raise questions that would jeopardize his chance of admission. It would also interrupt his academic experience." *Id.*  Lastly, Ms. Doe asserts PPS states "without support, that John's academics would not be disrupted." *Id.*  But in fact, she argues, this "contradicts the recommendation of Dr. Ostrander" and "disregards the significant possibility that John will not be able to continue in the same academic classes at another school." *Id.*

## IV.   LEGAL STANDARD

The procedural posture of this case falls between a motion for a TRO and a motion for a preliminary injunction.  TROs allow courts to provide emergency relief on an ex parte basis and to "preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction."  11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL RULES OF CIVIL PROCEDURE § 2951, at 253 (2d ed. 1995).  Preliminary injunctions are "issued to protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits."  *Id.* § 2947, at 121 (2d ed. 1995).  TROs may be granted with or without notice to the adverse party, though they must comply with

Rule 65(b) if they are granted without notice.  *Id.* at 253-54; FED. R. CIV. P. 65(b).

Preliminary injunctions will, in the usual case, "be decided only after the parties have

presented testimony in support of their respective positions," although Rule 65 does

not explicitly require a hearing.  11A WRIGHT, MILLER & KANE § 2949, at 220.

Here, PPS was given notice and an opportunity to respond, but the timing of

the Ms. Doe's motion precluded an evidentiary hearing, forced PPS to file her the

following day after receiving notice of the motion, and required the Court to issue this

Order the day after receiving the Plaintiffs' reply brief.[4]

The standard for issuing a temporary restraining order is the same as for a

preliminary injunction and is provided by traditional equity doctrines.  *Aftermarket

Auto Parts Alliance, Inc. v. Bumper2Bumper, Inc.*, Civil No. 1:12-cv-00258-NT, 2012

U.S. Dist. LEXIS 143685, *3 (D. Me. Oct. 4, 2012); 11A WRIGHT, MILLER & KANE §

2942, at 37.  To obtain preliminary injunctive relief, whether a temporary restraining

order or a preliminary injunction, the plaintiff must demonstrate: 1) "a likelihood of

success on the merits, 2) a likelihood of irreparable harm [to the movant] absent

interim relief, 3) a balance of equities in the plaintiff's favor, and 4) [that the

preliminary injunctive relief would be in] service of the public interest."  *Arbojet, Inc.

v. Rainbow Treecare Sci. Advancements*, 749 F. 3d 168, 171 (1st Cir. 2015).

As the moving party, the plaintiff "bears the burden of establishing that these

four factors weigh in its favor."  *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d

---

[4]      In ruling on the motion as quickly as possible, the Court has done its level best, but the parties
should appreciate "the temporal constraints under which the district court labored."  *See Bl(a)ck Tea
Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

13, 18 (1st Cir. 2006). "A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Federal Savings Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)). While "trial courts have wide discretion in making judgments regarding the appropriateness of" preliminary injunctive relief, *Sanchez v. Esso Std. Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2010), it is well established "that the Court is to bear constantly in mind that an injunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case." *Saco Defense Sys. Div. Maremont Corp. v. Weinberger*, 606 F. Supp. 446, 450 (D. Me. 1985).

## V.   DISCUSSION

Because Ms. Doe has alleged three different claims, each of which if meritorious would independently weigh in favor of the Court granting injunctive relief, the Court addresses the likelihood of success on the merits of the First Amendment claim and the two disability discrimination claims before addressing the remaining preliminary injunctive relief factors.

### A.   Likelihood of Success on the Merits

The First Circuit has observed that likelihood of success on the merits is both the "sine qua non" and the "most important part of the preliminary injunction assessment," explaining that "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7, 10 (1st Cir. 2012)

(quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2008), and *New Comm Wireless Servs. Inc. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).  To carry their burden on this factor, the Plaintiffs "must establish a 'strong likelihood' that they will ultimately prevail."  *Id.* at 10 (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

## 1.    First Amendment Claim

The Supreme Court has made "clear that students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'" *Mahanoy*, 141 S. Ct. at 2044 (quoting *Tinker*, 393 U.S. 503, 506 (1969)); *accord Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 794 (2011) ("[M]inors are entitled to a significant measure of First Amendment protection") (alteration in original; internal quotation marks omitted).  In fact, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  *Tinker*, 393 U.S. at 512 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

But the Supreme Court has also "made clear that courts must apply the First Amendment 'in light of the special characteristics of the school environment.'" *Mahanoy*, 141 S. Ct. at 2044 (quoting *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266, (1988) (internal quotation marks omitted)).  "One such characteristic . . . is the fact that schools at times stand *in loco parentis*, *i.e.*, in the place of parents."  *Id.* (citing *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986)).  The Court has also specifically "outlined three specific categories of student speech that schools

may regulate in certain circumstances include: 1) indecent, lewd, or vulgar speech uttered during a school assembly on the school grounds; 2) speech, uttered during a class trip, that promotes illegal drug use; and 3) speech that others may reasonably perceive as bearing the imprimatur of the school, such as that appearing in a school-sponsored newspaper." *Mahanoy*, 141 S. Ct. at 2045 (quoting *Bethel School Dist.*, 478 U.S. at 685 and *Morse v. Frederick*, 551 U.S. 393, 409 (2007) and *Kuhlmeier*, 484 U.S. at 271) (cleaned up).   Finally, in *Tinker*, the Supreme Court said "schools have a special interest in regulating speech that 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.' *Mahanoy*, 141 S. Ct. at 2045 (quoting *Tinker*, 393 U.S. at 513).

All these "special characteristics call for special leeway when schools regulate speech that occurs under its supervision." *Id.*   While schools' license to regulate speech is at its highest when it occurs on campus, it does not disappear simply because speech occurs off campus.   *Id.*   Instead, a "school's regulatory interests remain significant in some off-campus circumstances." *Id.*   In fact, *Tinker* specifies that "conduct by the student, in class or out of it, which for any reasons—whether it stems from time, place, or type of behavior . . . is not immunized by the constitutional guarantee of free speech" if leads to material disruption, substantial disorder, or the invasion of the rights of others.   *Tinker*, 393 U.S. at 513.   The Supreme Court, in *Mahanoy*, explicitly refused to delineate "what counts as 'off campus' speech and whether or how ordinary First Amendment standards must give way off campus to a school's special need to prevent, *e.g.*, substantial disruption of learning-related

activities or the protection of those who make up a school community." *Mahanoy*, 141 S. Ct. at 2045. This refusal was because of how fact-specific this inquiry ultimately is. *See id.* However, the Supreme Court's reference to the *Tinker* factors made clear that "*Tinker*'s highly general statement about the nature of a school's special interests" remained good law and implies that there are indeed times when "First Amendment standards must give way off campus to a school's special need to prevent" some on-campus ramifications of said off-campus speech. *See id; accord Chen Through Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 719-720 (9th Cir. 2022), *cert. denied sub nom. Epple v. Albany Unified Sch. Dist.,* 143 S. Ct. 2641 (2023) (holding a three-factor test considering "the degree and likelihood of harm to the school caused augured by the speech, (2) whether it was reasonably foreseeable that the speech would reach and impact the school, and (3) the relation between the content and context of the speech and the school" was consistent with *Mahanoy*).

The Supreme Court went on to "mention three features of off-campus speech that often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech," thereby diminishing "the strength of the unique educational characteristics that call for special First Amendment leeway." *Id.* at 2046. These three diminishing features are 1) that schools rarely stand *in loco parentis* off-campus, 2) "courts must be more skeptical of a school's efforts to regulate off-campus speech," and 3) schools have "an interest in protecting a student's unpopular expression, especially when the expression takes place off campus." *Id.* These factors fit comfortably with an application of the factors outlined in *Tinker*. *Cf.*

*Chen Through Chen*, 56 F.4th at 719-720 (holding the additional specific considerations that the Court identified in *Mahonay* fit comfortably within the three-factor framework).

With that explication of the parameters outlined by the Supreme Court on cases where the school's, or school district's, interest in regulating First Amendment speech is allowed, the Court now turns to the fact-intensive inquiry in the present case, which is "at the outer boundaries as to when courts should apply school speech precedents." *Morse v. Frederick*, 551 U.S. 393, 401 (2007) (citing *Porter v. Ascension Parish School Bd.*, 393 F.3d 608, 615 n.22 (5th Cir. 2004)).

The parties' countervailing arguments set out why this case is on the outer boundary.  On the one hand, Ms. Doe argues, accurately, that PPS's "basis for John's involuntary transfer consists only of off-campus speech in the form of private text messages to peers that were later forwarded to the school." *Pl.'s Mot.* at 11.  On the other hand, PPS accurately argues that Ms. Doe's legal argument "oversimplifies the nexus between the PHS community and John's speech." *Defs.' Opp'n* at 7.  That is to say, the present facts fall in the increasing group of scenarios where a student's off-campus speech manages to have very real on-campus ramifications.  Citing *Mahanoy*, Doe accurately argues that John's speech being off campus diminishes "the leeway the First Amendment grants [the school district] to regulate speech." *Pl.'s Reply* at 4 (citing *Mahanoy*, 141 S. Ct. at 2046).

Again relying on *Mahanoy*, Ms. Doe argues the *Tinker* "on-campus speech test" "does not apply." *Id.* at 4 (citing *Mahanoy*, 141 S. Ct. at 2045).  However, in *Tinker*,

the Supreme Court explicitly stated that "conduct, by the student, *in class or out of it*, which for any reasons—whether it stems from time, place, or type of behavior . . . is not immunized by the constitutional guarantee of free speech" if leads to material disruption, substantial disorder, or the invasion of the rights of others. *Tinker*, 393 U.S. at 513 (emphasis supplied).

This leaves the Court unpersuaded that *Tinker* only applies to on-campus speech. On the very page that Ms. Doe cites in *Mahanoy*, the Supreme Court disavows that the special characteristics discussed in *Tinker* "disappear when a school regulates speech that takes place off campus." *Mahanoy*, 141 S.Ct. at 2045. In fact, the Supreme Court goes on to say that "[t]he school's regulatory interests remain significant in some *off-campus* circumstances." *Id.* (emphasis supplied). The Court, in line with Supreme Court precedent, holds that the *Tinker* factors are not applicable only when on-campus speech is being regulated.

Ms. Doe, having taken issue with *Tinker*, offered that the "test set forth in *Mahanoy* is the appropriate standard." *Pl.'s Reply* at 5. However, the Supreme Court did not forth a test in *Mahanoy*. The *Mahanoy* Court explicitly refused to do so. *Mahanoy*, 141 S. Ct. at 2045 ("Thus, we *do not now set forth a broad, highly general First Amendment rule* stating just what counts as "off campus" speech and whether or how ordinary First Amendment standards must give way to a school's special need to prevent, *e.g.*, substantial disruption of learning-related activities or the protection of those who make up a school community.") (emphasis supplied). Instead, the Supreme Court opted to "mention three features of off-campus speech that often, even

29

if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech." *Id.* at 2046.  These three diminishing features are 1) that schools rarely stand *in loco parentis* off-campus, 2) "courts must be more skeptical of a school's efforts to regulate off-campus speech," and 3) schools have "an interest in protecting a student's unpopular expression, especially when the expression takes place off campus." *Id.*  The Court agrees that these three features diminish PPS's ability to regulate John's speech, but they are to be considered alongside the *Tinker* factors, as a supplement.  Guided by the Supreme Couret, the Court, therefore, uses the diminish features in that way.  *See id.*

 If *Tinker* controls, as the Court finds that it does, PPS argues that any regulation of John Doe's speech was permissible because "there was actual disruption on school premises," it was "reasonable—and arguably obligatory—for school officials to anticipate a disruption," and "John Doe's text messages invaded the rights of other students 'to be secure and to be let alone.'" *Id* at 9-10 (quoting *Tinker*, 393 U.S. at 508).  The Court, after reviewing the full record before it, agrees. While any one of these *Tinker* factors would be enough to allow the school district's curtailing of John's free speech, all three are present here.

The Court begins with actual disruption of school premises.  PPS provides multiple pieces of evidence showing such a disruption.  John's lengthy sexualized message, references a female peer as the object of his sexual desire, and describing her increased risk of murder when around him, was "displayed on a phone and passed around a class by students so that it was viewed by every student in the room."

*Townsend Decl.* ¶ 17.  It was later "shared by students during the school day."  *Id.*  It is hard to see how this would not disrupt classroom instruction, the core mandate of PPS is tasked with.

While Ms. Doe emphasizes that the messages by John were meant to "private," his efforts failed.  "Given the ease with which electronic communications may be copied or shown to other persons, it was plainly foreseeable" these communications "would ultimately hit their targets, with resulting significant impacts to those individual students and to the school as a whole."  *Chen*, 56 F.4th at 720-21 (citing *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 762 (8th Cir. 2011) (upholding school discipline against D.J.M. for private instant messages to C.M. that contained threats towards classmates, stating that "a reasonable person should be aware that electronic communications can now be easily forwarded" and that, "[s]ince C.M. was a classmate of the targeted students, D.J.M. knew or at least should have known that the classmates he referenced could be told about his statements").  Although not binding, the Court accepts the persuasive value of these decisions given how analogous these cases are to the present facts.

"*Mahanoy* makes clear, the mere fact that a student's off-campus communication finds its way to the school is not alone sufficient to warrant regulation by school officials."  *Chen*, 56 F.4th at 720 (citing 141 S. Ct. at 2047 (invalidating school's discipline over B.L.'s off-campus speech despite the fact that she used a medium that clearly "risk[ed] transmission to the school itself")).  However, given the facts here, it was "reasonable—and arguably obligatory—for school officials to

anticipate a disruption" if John were allowed to return to campus as if his text messages were normal communication between peers. *Defs.' Opp'n* at 9-10 (quoting *Tinker*, 393 U.S. at 508). Several students spoke to the school administrators about their concerns about John. *Obare Decl.* ¶ 6. Others expressed harm about John harming himself, harming others, and failing to respect boundaries with females as exemplified by him repeatedly saying things like "I know where you live" or "I can find where you live" as well as repeatedly calling and contacting them, at times discussing sexual material. *Id.* ¶¶ 7-10. "A total of five female students have requested that the school prohibit John from having contact with them." *Id.* ¶ 11. For students to face the daily presence of another student who has threatened them clearly disrupts the intended functioning of a place of learning. Based on this record, the Court concludes that  it is reasonable for PPS to have believed, and acted on the belief, that John returning to the school would continue to "materially disrupt[] classwork or involve substantial disorder." *Tinker*, 393 U.S. at 513. His presence at the school and the off-campus messages he sent already caused such disruption and disorder.

Finally, even if neither of these *Tinker* factors were persuasive—which they are—PPS may regulate John's speech because it qualifies as "serious or severe bullying or harassment," which *Mahanoy* specifically identifies as an "off-campus circumstance[ ]" in which "[t]he school's regulatory interests remain significant." 141 S. Ct. at 2045; *accord Doe v. Hopkinton Pub. Sch.*, 19 F.4th 493, 505-06 (1st Cir. 2021) ("The Supreme Court made clear in *Mahanoy* . . . that schools have a significant

interest in regulating 'serious or severe bullying or harassment' that invades the rights of others . . . . This pedagogical interest remains even in off-campus circumstances"). Again, regardless of John's intention, there are several recorded instances of his speech making others, particularly female students legitimately feel harassed.

Merriam-Webster defines "harass" as "to annoy persistently" or "to create an unpleasant or hostile situation for especially by uninvited and unwelcome verbal or physical conduct." *Harass*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/harassment (last updated Oct. 23, 2023). Similarly, the Oxford English Dictionary as "[t]o subject (a person or group) to unwarranted . . . speech or behavior causing annoyance, alarm, distress, or intimidation, usually persistently over a period of time." *Harass*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/harass_v?tab=meaning_and_use#2041087 (last visited Nov, 3, 2023). Black's Law Dictionary likewise defines harassment as "[w]ords, conduct, or action (usually repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial emotional distress to that person and serves no legitimate purpose." *Harassment*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Under all these definitions, the Court finds that John's communications constitute harassment. John has, among other things, sent texts to classmates that suggest he knows where they live and that he wants to commit violent acts. These communications understandably created fear and apprehension on the part of their

recipients. Therefore, the Court finds that PPS can also regulate John's speech under the third *Tinker* factor.

Having found that *Tinker* controls, and that PPS was justified in regulating John's speech under any of the three *Tinker* factors, the Court concludes that PPS' regulation of John's speech was permissible and not a violation of John's First Amendment rights. Therefore, Ms. Doe has failed to carry her burden of showing a likelihood of success on the merits with respect to her claim that PPS violated John's First Amendment rights.

### 2. Ms. Doe's Claims Under Section 504 Claim of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act

Under section 504 of the Rehabilitation Act of 1973, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  Title II of the Americans with Disabilities Act (ADA) is similar, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Because of the similarities between the two statutes, the First Circuit has held that the "same standards . . . apply to claims under the ADA and under the rehabilitation Act."  *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 11 n.1 (1st Cir. 2004).  Under this joint standard, a party seeking relief must establish that (1) "he is a qualified individual with a disability," (2) "he was excluded

from participating in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against," and (3) "such exclusion, denial of benefits, or discrimination was by reason of his disability." *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006).

Here, the parties disagree about whether Ms. Doe has shown that the decision to prohibit John from returning to PHS was made "by reason of his disability." Ms. Doe accuses PPS of ordering John's "involuntary transfer in response to a stereotypical expression of fear and discomfort by a small group of students at PHS." *Pl.'s Mot.* at 16. PHS counters that its "actions have been in response to John's conduct and the CSTAG threat evaluation, not based on or even in response to John's disability." *Def.'s Opp'n* at 17.

After reviewing the evidence, the Court finds that Ms. Doe has failed to show that PPS acted "by reason of" John's disability. The return-to-school plan shared with Ms. Doe and John by PPS states that John was found to have violated three PPS policies. *Defs.' Opp'n* at 9. These policies prohibit "[v]iolent, threatening or menacing behavior," "verbal or written statements (including those made on or through a computer or other electronic device) which threaten, intimidate, or harass others," and harassment of students based on sex and gender, among other things. *Townsend Decl.* ¶¶ 8-11. While it is true that five female students also expressed discomfort at the prospect of John returning to PHS, this does not negate PPS' finding that John's actions violated district policy. As PPS has maintained, "PHS's actions are not based solely on those students' expressions of fear or discomfort, but rather on school

administrators' and Dr. Moran's independent analysis of John's actions and needs in order to move forward." *Defs.' Opp'n* at 18.

Given the language in John's communications, Ms. Doe has not presented any evidence to negate PPS' assertions that it formulated John's return-to-school plan based at least in part on its conclusions that John's conduct violated district policy. Therefore, the Court does not find that PPS' decision to prohibit John from returning to PHS was made by reason of John's disability. There is ample evidence in the record that this decision was made because of John's conduct. Thus, the Court finds that Ms. Doe has failed to carry her burden of showing that she is likely to succeed on the merits of her Rehabilitation Act and ADA claims.

### B.     Likelihood of Irreparable Harm

Plaintiffs seeking preliminary relief must demonstrate "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "[I]rreparable harm can consist of 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'" *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (*Ross-Simons II*) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (*Ross-Simons I*)). "[D]istrict courts have broad discretion to evaluate the irreparability of alleged harm." *Ross-Simons II*, 217 F.3d at 13 (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989)).

Ms. Doe argues that, in the absence of preliminary relief, John will suffer irreparable harm due to (i) loss of educational opportunities, (ii) loss of athletic

opportunities, and (iii) disruptions in the college application and recruiting process. The Court disagrees that these considerations, alone or together, rise to the level of irreparable harm.

Courts have found that the complete deprivation of educational opportunities constitutes irreparable harm. *See Johnson v. Collins*, 233 F. Supp. 2d 241, 251-52 (D.N.H. 2002) ("The loss of Andrew's right to a free public education, and its likely impact on his future opportunities, is not accurately measurable or adequately compensable by money damages"); *Brown v. Bd. of Educ. of Rochester City Sch. Dist.*, No. 04-CV-6596L, 2005 WL 17838, at *1 (W.D.N.Y. 2005) ("The longer Nicholas's expulsion continues, the longer he will be deprived of a formal education. Courts have held that such a deprivation of one's education inflicts harm that cannot be remedied by money damages"). The denial of the opportunity to attend one's school of choice has likewise been found to constitute irreparable harm when accompanied by a deprivation of procedural due process. *See Murphy v. Fort Worth Indep. Sch. Dist.*, 258 F. Supp. 2d 569, 575 (N.D. Tex. 2003), *vacated on other grounds*, 334 F.3d 470 (5th Cir. 2003) ("Carter will suffer irreparable injury if such an injunction is not granted. He would be denied, without having had his procedural due process rights recognized, the valuable right to continue his education at his home school").

In the absence of an alleged due process violation, however, courts "routinely hold that a student suffers no irreparable harm where the District provides an alternative educational option and where the student can stay on track to graduate." *McKinney ex rel. K.P. v. Huntsville Sch. Dist.*, 350 F. Supp. 3d 757, 771 (W.D. Ark.

2018); *cf. Axelrod v. Phillips Academy, Andover*, 36 F. Supp. 2d 46, 50 (D. Mass. 1999) (finding that the plaintiff would suffer irreparable harm "because he would not graduate with his class, he could not attend college in the fall, and he would suffer the stigma of expulsion").

"Courts have routinely rejected the notion that a student suffers irreparable harm by not being permitted to participate in interscholastic athletics." *McGee v. Va. High Sch. League, Inc.*, 801 F. Supp. 2d 526, 531 (W.D. Va. 2011); *see also Dziewa v. Pa. Interscholastic Ath. Ass'n*, No. 08-5792, 2009 U.S. Dist. LEXIS 3062, at *17-18 (E.D. Pa. Jan 16, 2009) ("This Court, as well as all other federal courts, have previously and consistently held that ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm"); *S.B. ex rel. Brown v. Ballard Cty. Bd. of Educ.*, 780 F. Supp. 2d 560, 569 (W.D. Ky. 2011) (rejecting plaintiff student's argument that forced transfer to an alternative school for disciplinary reasons would inflict irreparable harm in the form of exclusion from playing on original school's softball team).

Likewise, "courts reject the notion that loss of a potential scholarship may constitute irreparable harm." *McKinney ex rel. K.P. v. Huntsville Sch. Dist.*, 350 F. Supp. 3d 757, 771 (W.D. Ark. 2018). This is particularly true where the party seeking preliminary injunctive relief has failed present evidence of concrete scholarship opportunities. *See Dziewa*, 2009 U.S. Dist. LEXIS 3062 at *18-19 (finding that plaintiffs did not show irreparable harm due to potential negative impacts on recruiting opportunities because such "arguments consist of threatening possibilities,

which are speculative, and not the kind of harm that preliminary injunctions were fashioned to address").

Here, Ms. Doe has failed to carry her burden of demonstrating that John will suffer irreparable harm absent the issuance of a TRO.  The Court agrees with the other courts that have considered the issue that an inability to participate in interscholastic athletics, and the resulting negative impacts on college recruiting, do not amount to irreparable harm.  This is particularly true where, as here, PPS has not prohibited John from running track and cross-country altogether.  It has only determined that John may not run for PHS.  While John may prefer to run for PHS, the Court finds that an inability to run for PHS, standing alone, cannot rise to the level of irreparable harm. Further, although it is true that John may have to explain to college coaches and athletic departments why he no longer runs for PHS, this potential consequence is exactly the type of speculative harm the *Dziewa* court rejected.  *See Dziewa*, 2009 U.S. Dist. LEXIS 3062 at *18-19.  Therefore, the Court holds that John cannot show irreparable harm based on an inability to run for PHS and the potential consequences that might have for college recruiting.

This leaves Ms. Doe's argument that John will suffer irreparable harm if he transfers to Casco Bay or Deering High Schools based on a loss of educational opportunities.  Ms. Doe represents that John "has worked hard to craft an academic schedule at PHS that would permit him to earn the credits needed for graduation, capture all the prerequisites for college programming he seeks to pursue, [and] complete his carpentry certification." *Pl.'s Mot.* at 17.  She also suggests that there

is a "significant possibility that John will not be able to continue in the same academic classes at another school." *Pl.'s Reply* at 6. PPS, on the other hand, has represented that "John will be able to receive comparable instruction at either Casco Bay High School or Deering High School to what he would have received at Portland High School." Townsend Decl. ¶ 40.

The record is murky as to how John's transfer to either Casco Bay High School or Deering High School would affect his education. It seems clear enough that John would continue to receive an education at either alternative school. Further, neither party has suggested that John would not be able to graduate on time were he to transfer to a different school. Indeed, PPS has even represented that John has been working with his teachers and a tutor during his suspension. See *Doe Decl.* ¶ 31 ("He is invested in his current PHS classes and has been working with his teachers, tutor, and senior planning advisor to complete all his work"). In the absence of any evidence to the contrary, then, the Court will assume that John will be able to graduate on time even if he changes schools as required by his return-to-school plan.

Given that John seems to be able to graduate on time, and has not alleged a violation of due process, this situation appears more akin to those in which courts have declined to find irreparable harm. *See McKinney ex rel. K.P. v. Huntsville Sch. Dist.*, 350 F. Supp. 3d 757, 771 (W.D. Ark. 2018). There is, however, one more wrinkle to consider: the PATHS Program. It is also unclear from the record whether John will be able to complete his carpentry certification in conjunction with coursework at Casco Bay High School and/or Deering High School. Likewise, it is unclear whether

PATHS is part of John's curriculum, or something he does in addition to his required coursework.

Given that Ms. Doe bears the burden of showing that John will suffer irreparable harm absent a TRO, however, the Court resolves this evidentiary ambiguity in favor of PPS. It may be that John will be able to complete the PATHS program even if he leaves PHS. Even if John can devote the same amount of time to PATHS during the school day, moreover, it may be possible for him to make up the time after school hours. As it stands, the record suggests that John will be able to graduate on time under his return-to-school plan, and he may even be able to complete the PATHS Program as well. Therefore, based on this record, the Court is unable to conclude that John will suffer irreparable harm absent a TRO.

### C.   Balance of Equities

When considering whether to grant preliminary injunctive relief, the Court must weigh the balance of equities to determine whether the injury to the plaintiff in the absence of a TRO outweighs any harm to the defendant. Ms. Doe contends that John would suffer sever harm absent a TRObecause PPS' re-entry plan amounts to a "termination of his programming and affiliation with PHS during his senior year, needlessly damag[ing] his college recruiting opportunities and plac[ing] his mental health at risk." *Pl.'s Mot.* at 18. Further, she contends that PPS would suffer "[l]ittle, if any harm" were the Court to grant preliminary injunctive relief, because "(a) John poses no risk of harm to students or staff at PHS, (b) he has agreed to abide by the terms of the District Court's stipulated protection from harassment order and the

recommendations in Portland's psychological report, and (c) the return to PHS promises to have therapeutic benefits for John." *Id.* at 19. After reviewing the record before it, the Court finds this to be an oversimplification.

PPS has put forth considerable evidence concerning the impact of John's actions on the students and staff at PHS. John's peers have repeatedly reported to school administrators concerning text messages sent by John. *See Townsend Decl.* ¶ 15. PHS administrators have reported that such messages have caused "substantial disruption within the school," including one message being "displayed one a phone and passed around the class so that it was viewed by every student in the room." *Obare Decl.* ¶¶ 3-4. Students at PHS have expressed concern that John's statements, and "some female students . . . have expressed anxiety over their perception that John does not respect boundaries." *Id.* ¶¶ 8-11. Furthermore, John's has prompted the PHS cross-country coach to inform the school's athletic director that he no longer wants John on his team because of John's "sexually harassing behavior and threats toward female team members." Townsend Decl. ¶ 20. Assistant Principal Obare confirmed that she has "heard several times from the coach of the [cross-country] team about his concern for the emotional well-being of the team" as a result of John's conduct. Obare Decl. ¶ 12.

Based on this record, John's return to school would likely cause substantial disruptions for other students and staff at PHS. It may have a particularly negative impact on those students who have expressed concerns for their safety, especially those on the cross-country team. Given the distinct possibility that widespread

negative effects would result from John's return to PHS, the Court disagrees with Ms. Doe's contention that the balance of equities weighs in favor of granting a TRO. While the Court understands Ms. Doe's concern about John's mental health being negatively impacted by a transfer to a different high school, the potential effects of John's return to PHS on the mental health of many of his classmates counsels in favor of denying the request for a TRO based on the balance of equities.

### D.   Public Interest

"The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief." *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Ms. Doe asserts that the public interest "weighs in favor of requiring" PPS to (i) "honor John's First Amendment right to free speech," (ii) "comply with the ADA and section 504 by not acquiescing to stereotypical fears concerning a student with a mental health disability who is in treatment and presents no risk to others," and (iii) "respect the public process developed by the school district by which Portland residents select a high school." *Pl.s Mot.* at 19. PPS counters that granting preliminary injunctive relief would go against its interested in creating a stable educational environment for all students. *Def's Opp'n* at 20.

The Court agrees with PPS that the public interest favors the denial of injunctive relief in this case.  As PPS has stated, the provision of a safe educational environment for all students is the paramount obligation of a school board.  This obligation outweighs the public interest in adherence to the process for choosing a high school, which, presumably, is subordinate to the obligation to provide a stable school environment.  Therefore, the Court finds that the public interest favors denial of preliminary injunctive relief.

## VI.   CONCLUSION[5]

The Court DENIES the Plaintiff's Motion for Temporary Restraining Order (ECF No. 4).  The Court reserves ruling on the motion for preliminary injunction and will discuss future proceedings with counsel at the conference scheduled for November 6, 2023.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of November, 2023

---

[5]      Given the urgency of this order and its contents, the Court is issuing this order under seal for the moment.  The Court will discuss with counsel the extent to which the order should be unsealed, perhaps with some redactions.  *See United States v. Kravetz*, 706 F.3d 47 (1st Cir. 2013).